1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

STEPHEN D. COMSTOCK,

    *Petitioner*,

vs.

STEFANIE HUMPHRIES, *et al.*,

    *Respondents*.

3:10-cv-00147-LRH-WGC

ORDER

This habeas matter under 28 U.S.C. § 2254 comes before the Court for a final decision.

### *Background*

Petitioner Stephen Comstock challenges his 2004 Nevada state conviction, pursuant to a jury verdict, of possession of stolen property and his adjudication as a habitual criminal.  He challenged his conviction in the state courts on direct appeal and in two state post-conviction petitions.

### *Standard of Review*

The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly deferential" standard for evaluating state-court rulings that is "difficult to meet" and "which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).  Under this highly deferential standard of review, a federal court may not grant habeas relief merely because it might conclude that a decision was incorrect.  131 S.Ct. at 1411.  Instead, under 28 U.S.C. § 2254(d), the court may grant relief only if the  decision: (1) was either contrary to or involved an unreasonable application of clearly established law as determined by the United States Supreme Court based on the record presented to the state courts; or (2) was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding.  131 S.Ct. at 1398-1401.

1    A state court decision on the merits is "contrary to" law clearly established by the Supreme

2    Court only if it applies a rule that contradicts the governing law set forth in Supreme Court case law or

3    if the decision confronts a set of facts that are materially indistinguishable from a Supreme Court

4    decision and nevertheless arrives at a different result. *E.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 15-16

5    (2003). A decision is not contrary to established federal law merely because it does not cite the

6    Supreme Court's opinions. *Id.* Indeed, the Court has held that a state court need not even be aware of

7    its precedents, so long as neither the reasoning nor the result of its decision contradicts them. *Id.*

8    Moreover, "[a] federal court may not overrule a state court for simply holding a view different from its

9    own, when the precedent from [the Supreme] Court is, at best, ambiguous." 540 U.S. at 16. For, at

10   bottom, a decision that does not conflict with the reasoning or holdings of Supreme Court precedent is

11   not contrary to clearly established federal law.

12   A state court decision constitutes an "unreasonable application" of clearly established federal

13   law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts

14   of the case was not only incorrect but "objectively unreasonable." *E.g., Mitchell*, 540 U.S. at 18; *Davis*

15   *v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

16   To the extent that the state court's factual findings are challenged, the "unreasonable

17   determination of fact" clause of Section 2254(d)(2) controls on federal habeas review. *E.g., Lambert*

18   *v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be

19   particularly deferential" to state court factual determinations. *Id*. The governing standard is not

20   satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973.

21   Rather, AEDPA requires substantially more deference to the state court's determination:

22

23   . . . . [I]n concluding that a state-court finding is unsupported by
     substantial evidence in the state-court record, it is not enough that we
     would reverse in similar circumstances if this were an appeal from a

24   district court decision. Rather, we must be convinced that an appellate
     panel, applying the normal standards of appellate review, could not

25   reasonably conclude that the finding is supported by the record.

26   *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

27   Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless

28   rebutted by clear and convincing evidence.

1    The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled

2 to habeas relief. *Pinholster*, 131 S.Ct. at 1398.

3                                         ***Discussion***

4 **Ground 1:  Alleged Brady Violation**

5    In Ground 1, petitioner alleges that he was denied rights to due process and a fair trial in

6 violation of the Fifth, Sixth and Fourteenth Amendments because the State concealed from the defense

7 allegedly prior statements by the owner of the ring in question that he could have lost the ring outside

8 his apartment after removing it while washing his motorcycle.

9    The related trial evidence included the following.[1]

10    On August 14, 2003, Stephen Comstock pawned a national collegiate wrestling championship

11 ring at a pawnshop in Reno, Nevada.  A person pawning an item was required to show a government-

12 issued picture identification.  Comstock showed his identification when he pawned the ring, and the

13 pawnbroker positively identified him at trial as the person who pawned the ring.  Surveillance video

14 further showed Comstock pawning the ring, and his name was on the pawn ticket.  When Comstock

15 later was questioned by the police, he ultimately acknowledged that he had pawned the ring.[2]

16    The ring was a large gold college ring with a red stone that had what appeared to be a diamond

17 set in the middle.  The ring had 1991-92 engraved on one side and the words "National Champion" and

18 "Northern Montana College" engraved on the other.  The ring also had what appeared to be the last

19 name "Street" engraved on it along with what appeared to be a weight class of 150.[3]

20    As part of his duties, Detective Reed Thomas regularly reviewed Reno area pawnshop

21 transaction logs.  The pawn of an individual's college sports championship ring stood out to him.  He

---

23    [1]The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or
statements of fact in the state court.  The Court summarizes same solely as background to the issues presented in this
24 case, and it does not summarize all such material.  No statement of fact made in describing statements, testimony or
other evidence in the state court constitutes a finding by this Court.  Any absence of mention of a specific piece of
25 evidence or category of evidence in this overview does not signify that the Court has overlooked the evidence in
considering petitioner's claims.

26
   [2]#16, Ex. 13, at 17-31 (pawnbroker Brian Rocca); *id.*, at 32-34 & 51-57 (foundation witnesses); *id.*, at 61-63
27 (Detective Thomas); #16, Ex. 18, at 55-62, 67-70 & 73-82; see also #16, Ex. 14, at 16 & 21 (related closing argument).

28    [3]#16, Ex. 13, at 34-37 (Randy Street); *id.*, at 58-59 (Detective Thomas).

1   performed an internet search and identified Randy Street by school, year, and weight class as the likely

2   recipient of the championship ring for wrestling.  Detective Thomas further determined that a Randy

3   Street was in the Reno police database from an unrelated vehicle burglary report that he had made a year

4   earlier.[4]

5          When Detective Thomas called Randy Street, he acknowledged that the ring was his.  Street

6   thought that he still had the ring, which he said that he kept in a seashell in his apartment.  When he

7   went to confirm that the ring was in the seashell during the call, however, the ring was not there.[5]

8          Detective Thomas questioned Stephen Comstock at the police station initially generally

9   regarding what had been an ongoing rash of burglaries at the same apartment complex.  Comstock was

10  a maintenance worker at the apartment complex in which Street lived, and he lived in a complex that

11  was close by that was managed by the same company.  The detectives interviewed the two maintenance

12  men at the complex apparently on an initially stated premise that, as maintenance personnel constantly

13  on the property, they might have relevant information.  The police interview was recorded, and a

14  redacted version of the interview was presented to the jury at trial.[6]

15         Well before any discussion of the pawn transaction or the ring, Comstock referred to Danny

16  Carter as "the one I personally think [is] doin' it."  Thereafter, over the course of the interview,

17  Comstock elaborated that: (a) he knew Carter from years before; (b) Carter always was in a different

18  car and was stealing cars, "'[c]ause that's what he does;" (c) the maintenance personnel had asked

19  Carter to leave the property and would not allow him on the property; (d) Comstock had seen Carter

20

---

21         [4]#16, Ex. 13, at 57-60.

22         [5]#16, Ex. 13, at 60-61 & 69-71 (Detective Thomas); *id.*, at 37-38 (Street).

23         [6]#16, Ex. 13, at 61-68 (Detective Thomas); *id.*, at 39 (Street).  Comstock had been in Street's apartment with
24  the other worker previously doing maintenance work.  However, Street saw the ring still present in the apartment after
    that work.  *Id.*, at 38-42.  Defense witness Sharon Taylor testified at the March 2004 trial that, as resident housekeeper,
25  she had possessed a pass key to all of the apartment units until Comstock and the other maintenance worker changed all
    of the locks in April 2003, "to every apartment."  *Id.*, at 74-76 & 85-87.

26
           While the Court notes the foregoing, it was not necessary for the State to prove that Comstock entered Street's
27  apartment and stole the ring in order to convict him of possession of stolen property.  Whether he did, or not, would not
    appear to be material to the offense of which he was convicted – except perhaps as one possible manner of establishing
28  that he knew or reasonably should have known that the ring was the product of theft.

with an I.D. and a gun that Comstock previously had seen inside tenants' apartments; (e) Comstock had warned the other maintenance person not to hold items for Carter because they were stolen; (f) Carter would ask Comstock which apartments were empty, then "[b]oom somethin [sic] would happen and boom it'd be gone, with Carter then having "bags of jewelry," and "you just put two and two together and figure it out;" (g) one would "just know it's gotta be some kind of ring going' on," and he knew that Carter was "doin' cars . . . '[c]ause he told me he was doin' cars;" (h) Carter had asked Comstock "many times, if he could break into places, who's home and who's not" and the maintenance personnel would confront him "'[c]ause we knew he was doin' this s___ . . . that he [was] in the middle of some of it;" (i) "I'm tellin' ya, Danny CARTER, is the one doin' this s___" and Carter previously had brought items, including jewelry, to Comstock to sell and pawn but the ring allegedly was "the first one, one of the first items" that he pawned for Carter; (j) Carter had a large key ring with master keys "to cars and s___," as well as motel pass keys; (k) "I know he's been stealin' s___;" and (l) Carter had told him that he had pass keys to a nearby motel and had broken into rooms there.[7]

When Detective Thomas asked Comstock generally about pawning, Comstock discussed some personal items that he had pawned. He then volunteered that he had pawned a big gold ring for Danny Carter because Carter did not have an I.D. The discussion in the interval shortly thereafter included the following:

> Comstock: No, it was a lot bigger [than a ring of Comstock's]. I mean it – I don't even know where he got it from, but I – sure (inaudible). It was g - it was a great – it was a big, you know, a big gold ring.
>
> Thomas: Well, where do you think he got it?
>
> Comstock: I'm sure he stole it.  (inaudible) Like I said, Danny – that's what I kept tellin' Perry and everyone out there, "If you see this guy, you got a put a stop to 'im," because . . .
>
> Thomas: Right.
>
> Comstock: . . . I know he's, you know, I know he's  – I just know who he is.  I mean I don't – I can't say I see 'im in any

---

[7]#18, Ex. 88, at 18-25, 52, 59-64, 66-67, 74-75, 77-78, 86 & 87-88.  The Court is referring to the page numbers in the interview transcript itself, not the electronic docketing page numbers.

1   place.  He never told me he was in any place.  But I know
2   he's been in.  I just, I just know he has.

3   #18, Ex. 88, at 58-59.  See also *id.*, at 64 & 86, lines 31-33 (similar).

4       Comstock elaborated thereafter that: (a) Carter told him that he had no I.D. because he lost it
5   when he was running from the police, that he was broke, and that someone was going to kill him if he
6   did not pay them; and (b) Carter "had a sack of jewelry and stuff he wanted to go pawn."[8]

7       Later in the interview, however, over the course of which the detectives' focus had become more
8   clear, Comstock instead said: "Um, God Damn, I can't believe it was stolen."  He thereafter stated that
9   Carter had told him that the ring was his, that Carter's initials "D.C." were scratched inside the ring, and
10  that Carter told him that the ring had been his father's ring from when he was a wrestler or boxer.[9]

11      When Street had the ring, his initials "R.S" were engraved inside the ring.  When the ring was
12  recovered from the pawnshop, however, his R.S. initials had been scratched out; and the ring instead
13  had the barely readable initials "D.C." lightly scratched by hand inside the ring.[10]

14      Danny Carter was approximately 30 years old at the time of the 2004 trial.[11]  He therefore would
15  have been approximately 18 years old when his father allegedly won a national championship ring in
16  college wrestling in the 150 pound weight class in 1991-92.

17      Comstock stated that Carter gave him a thirty-dollar carton of cigarettes for pawning the ring
18  for him, from thirty cartons that Carter had stolen.[12]

19      Randy Street testified on direct that the last time that he remembered seeing the ring was
20  approximately two weeks prior to the detective's call.  On cross-examination, Street acknowledged
21  having occasionally misplaced the ring over the years indoors where he was living.  He testified as

22

23      [8]#18, Ex. 88, at 61, 63-65 & 67-70.

24      [9]#18, Ex. 88, at 75-76, 78-79, 81-82, 86-87 ("I knew Danny wasn't a fighter or nothin', but, you know, I've
25  heard stories about his old man") & 91.

26      [10]#16, Ex. 13, at 37 (Street); *id.*, at 68-69 & 71 (Detective Thomas).

27      [11]#16, Ex. 13, at 69 (Detective Thomas).

28      [12]#18, Ex. 88, at 88-89.

1   follows in response to defense questions inquiring as to whether he may have misplaced or lost the ring

2   outside:

| | | |
|---|---|---|
| 3 | Q | Have you ever dropped it outside, the ring? |
| 4 | A | Not that I'm aware of. |
| 5 | Q | But you could have and not known it? |
| 6 | A | I could have, but I don't think it would have been – would have never fallen out or dropped. |
| 7 8 | Q | It could - it sits in your – say it's in your pants and you take it down to the laundry, your girlfriends [sic] takes it down there, you ever left it in your pants? |
| 9 | A | No |
| 10 | Q | No? |
| 11 | A | I've never left it in my pants. |
| 12 | | . . . . . |
| 13 | Q | So for sure we know that you've lost it inside your apartment? |
| 14 | A | I've misplaced it in my apartment before, correct. |
| 15 16 | Q | To your knowledge, you don't know if you've lost it outside the apartment at all? |
| 17 | A | I don't know. |
| 18 | | . . . . . |
| 19 | Q | Now, as you sit here today, sir, you don't know if someone came into your apartment, took your ring, do you? |
| 20 21 | A | I've had eight months or more to think about that, sir, and no, I don't – I don't know if somebody came in my apartment or not. Alls [sic] I know is my ring came up missing and here I am. |

22

23   #16, Ex. 13, at 44-45 & 46-47.

24        Sharon Taylor, who had been the resident housekeeper at the complex at the relevant time,

25   testified for the defense.  According to Taylor, she found the ring in the dirt in a flower bed outside the

26   laundry room at the complex.  She testified that she later gave it to Danny Carter when he saw it sitting

27   on her coffee table, as she had no need for a man's ring.  Taylor acknowledged that she had dated

28   Stephen Comstock until May 2003 and that they had lived together for approximately three months.

1   She further acknowledged that they still were "very close" and that they had spoken several times prior
2   to trial.[13]

3          The other maintenance person, Perry Harring, also testified for the defense.  Harring testified
4   that he drove Comstock to the pawnshop.  According to Harring, Comstock told him that he was
5   pawning something for Danny Carter.  Harring testified that he thereafter drove Comstock to where
6   Carter was and Comstock gave Carter the money from the pawn.  He testified that Carter later told him
7   that he had picked the ring up on the ground "outside of, I guess, the owners of the ring's apartment."[14]

8          The defense also called Danny Carter, but he stated from the stand that he had not yet had an
9   opportunity to consult with his lawyer and had been told by his counsel to consult with him first.  The
10  trial court immediately recessed the matter for the day, cutting Carter off mid-sentence.  The next day,
11  after Carter had conferred with his counsel in private and also with the defense, the defense rested
12  without recalling Carter.[15]

13         The State then called Carter as a rebuttal witness.  Carter denied having seen the ring before.
14  He testified that his father was approximately 22 years older than him.  He acknowledged that he had
15  been convicted of a felony before, including for a drug offense and for a burglary.[16]

16         The trial court instructed the jury, *inter alia*, that Comstock was charged in the information with
17  possession of stolen property . . . in the manner following . . . [that he] did willfully and unlawfully
18  possess or withhold stolen goods . . . for his own gain or to prevent the true owner from again
19  possessing said property, knowing that the property was obtained by means of larceny or under such
20  circumstances as should have caused a reasonable man to know that such goods were so obtained." #16,
21  Ex. 15, Instruction No. 4.

---

23         [13]#16, Ex. 13, at 74-88.  During his interview by Detective Thomas, Comstock stated that Carter had been
24  staying with Taylor and that her pass key then came up missing. #18, Ex. 88, at 87-88.  Taylor no longer was working at
    the apartment complex at the time of trial and then was unemployed. #16, Ex. 13, at 75-76 & 85-86.

25         [14]#16, Ex. 13, at 88-95.  Harring's employment for the apartment company terminated in mid September 2003,
26  approximately a month after the ring was pawned.  *Id.*, at 89 & 92.

27         [15]See #16, Ex. 13, at 96-97; #16, Ex. 14, at 2-3.

28         [16]#16, Ex. 14, at 4-5.

The court further instructed the jury:

> The elements of Possession of Stolen Property are:
>
> 1)   A person, for his own gain or to prevent the owner from again possessing his property, buys, receives, possesses or withholds property
>
>> a.   Knowing that it is stolen property; or
>>
>> b.   Under such circumstances as should have caused a reasonable person to know that it is stolen property.
>
> . . . . .
>
> While it is necessary to show that the property was the product of theft, it is neither necessary to plead nor to prove the identity of the person who so stole the property.
>
> . . . . .
>
> In proving the possession of stolen goods with the knowledge that the same were stolen, the State is not required to establish the element of guilty knowledge by direct evidence, such as the defendant witnessing the stealing of the goods, or being told that they were stolen, but, on the other hand, it may be shown by circumstantial evidence. If stolen goods are received by a person under such conditions and circumstances as to lead him or her to believe that the same were stolen, then, in the contemplation of the law, he or she had guilty knowledge to the same extent as though he or she had personally witnessed the actual stealing thereof.

#16, Ex. 15, Instruction Nos. 22, 24 & 25.

The State argued in closing that Street did not lose the ring and that it was stolen by Carter, but it also argued that "[h]owever you look at it, it was stolen," as "[n]o one had permission to have that ring." The State argued that Comstock reasonably should have known that the ring was stolen given what he knew about Carter.[17]

The defense argued, in the main, that the State had not proven beyond a reasonable doubt that the ring was stolen. Referring to Sharon Taylor's testimony, defense counsel maintained:

> . . . . If you find something and you give it to someone else, that doesn't mean that it's stolen. In fact, it's found property. That's it.

#16, Ex. 14, at 19.

_____

[17]#16, Ex. 14, at 15-18.

1    In rebuttal, the State argued, *inter alia*:

2           Was the ring stolen?  It's clear.  Again, he admits possession of
     the property.  He admits it was for his own gain, because he received $60
3    for the property, for the ring, or a carton of cigarettes.  Whatever you
     choose to believe, he pawned it with the intention of never giving it back
4    to the owner.  He's not going to give it back to Randy Street.  He's not
     going to give it back to Daniel Carter.  He knew or should've known it
5    was stolen.

6    #16, Ex. 14, at 23.

7          The State questioned the veracity of Sharon Taylor's account, suggesting, *inter alia,* that she was

8    trying to protect Comstock.  The State further responded, however, to the defense's "found property"

9    argument with the following:

10          . . . .  She found this ring, yet she never turned it in to the
     apartment manager.  It was found at the apartment laundry, supposedly
11   in a flower box.  Yet she never turned it in to the apartment manager and
     she never sought out who the owner was, despite the fact that the name
12   is engraved on the ring, despite the fact that this is not just an ordinary
     ring.  This is a ring of incredible sentimental value.  It's a unique, rare,
13   custom ring that should anyone find it, any reasonable person would
     think, "My gosh, someone's really gotta be missing this.  This has gotta
14   be very important to someone."  Yet she took no actions to give it back,
     she kept it.

15                                    . . . . .

16          . . . .  She says she finds this gold ring that's worth anywhere
     from 400 to 600 dollars.  That's like finding a wallet full of money, with
17   $600 in it and an ID in it.  What does a reasonable person do?  They give
     the money back, if they're an honest person.  Do they take the money
18   and spend it?  No because that's like stealing that person's money.  It's
     not like finding a $20 bill when you don't know who the owner is.  She
19   knew, just like finding a wallet with money and an ID.

20   #16, Ex. 14, at 24 & 25.

21         The State did present argument during its rebuttal maintaining that the evidence, including

22   Street's testimony, supported an inference that the ring had been stolen from inside his apartment rather

23   than lost elsewhere.[18]

24         The State further presented argument, however, maintaining that the ring was stolen "no matter

25   which way you look at it" under the multiple contradictory accounts presented by Comstock and/or the

26   defense:

27   _____

28      [18]#16, Ex. 14, at 28-30.

                                         -10-

It was clearly stolen from his apartment, and no matter which way you look at it, it was stolen. [The State thereafter posits that the ring was stolen from the apartment by Comstock himself or Comstock reasonably should have known, under the scenario where he allegedly pawned the ring for Carter, that the ring was stolen because of what he knew about Carter.]

The State submits that every element of this offense has been proved. He was in possession of the ring. He pawned it for his own gain, for the money, for the carton of cigarettes. However you want to look at it, he never intended to give it back to the owner, give the stolen property back. Did he ever say, "Oh, by the way, I pawned this, but I'll give it back to you"? No. [The State thereafter elaborates further on the theme that Comstock knew that it was stolen either because he stole the ring or he received it from Carter in circumstances where a reasonable person would have known that it was stolen, including having the name "Street" engraved on it.]

So what you're left with is three or four stories that are completely opposite, completely different from each other. Throw them all out, throw out all the conflicting stories that contradict themselves and what do you have? You have the defendant in possession of the ring, who pawned it for $60, under circumstances where he absolutely should've known it was stolen. He had a ring with someone else's name on it, a collegiate championship ring. Where would a ring like that come from? If you throw out everybody's statements, still, the defendant was in possession of the ring, he pawned it for his own gain, and he knew or should have known it was stolen property.

#16, Ex. 14, at 30-32.

Following the guilty verdict, a March 25, 2004, presentence report included a statement by the owner of the ring, Randy Street. His handwritten statement read in full:

* I am not convinced that the ring was stolen. To have a clear conscience in this matter, I have to bring up the possibility that I may have placed my ring on the ground while outside the apartment washing my motorcycle. The ring is large (I can remember a time prior to the ring turning up missing) that I took it off for fear of scratching the paint or chrome. I placed it either on the ground or on the air conditioner outside & I don't remember putting it back on. The defense attorney kept asking if I may have dropped it out of pants pocket while I did laundry. I volunteered this info to Detective Reed and Prosecutor Erickson but it never came up @ trial. I never realized my ring was even missing until Detective Reed called and said he found it in pawn shop. I'd hate to see this gentleman sentenced for possession of stolen property if it was out of my ignorance of misplacing it. Please take this into consideration. He's probably served enough time for not asking nearby tenants if they were missing the ring. I don't believe my apartment was broken into if all they stole was a ring.

* Please make sure that the judge reads this!!

#18, Ex. 89, at 7.

-11-

1    Prior to the sentencing, Comstock moved for a new trial, based upon the letter constituting

2    newly discovered evidence and also establishing an alleged *Brady* violation by the State.[19]

3    In its opposition, the State maintained, *inter alia*, that: (a) Street never told the State that he may

4    have lost the ring; and (b) a possibility that the ring may have been lost was not material because such

5    a possibility would not preclude a conviction for possession of stolen property under Nevada law.

6    On the first point, the prosecutor stated in the opposition, without a supporting affidavit or

7    declaration, that Street emphatically said "No!" when he was asked by the prosecution "after the

8    preliminary hearing, but prior to trial" whether he could have lost the ring.  The prosecutor elaborated:

9    "When further pressed by the State as to whether it was *possible* he lost the ring, he paused,

10    thoughtfully, and responded that, well, *anything* is *possible* and it is *possible* he could have taken off

11    the ring while working on his motorcycle, but in all reality, that would not have happened since the ring

12    was so important to him and, further, that it did *not* happen."[20]

13    On the second point, the State contended that a possibility that the ring was lost initially by

14    Street was immaterial under the definition of "stolen property" in N.R.S. 205.275(7) and "theft" in

15    N.R.S. 205.0832(1)(d).

16    The first provision stated:

17       As used in this section, "stolen property" means property that has
         been taken from its owner by larceny, robbery, burglary, embezzlement,
18       theft or any other offense that is a crime against property . . . .

19
      N.R.S. 205.275(7).  The second provision stated:
20
21       . . . a person commits theft if, without lawful authority, he
         knowingly: . . . . (d) Comes into control of lost, mislaid or misdelivered
22       property of another person under circumstances providing means of
         inquiry as to the true owner and appropriates that property to his own use
23       or that of another person without reasonable efforts to notify the true
         owner.

24    N.R.S. 205.0832(1)(d).

25    _____

26    [19]#16, Ex. 17.

27    [20]#16, Ex. 18, at 5-6 (emphasis in original).  While the prosecution presents the alleged conversation differently
      than Street, it nonetheless is noteworthy that the State's account acknowledges that there in fact was a pretrial discussion
28    with Street of the possibility that he took off the ring while working on the motorcycle.

-12-

1    The State contended that, given the circumstances presented, including the unique identifying

2    engravings on the ring and Comstock's position as a maintenance worker at the complex:

3           . . . . Had the defendant come into possession of this ring in *any*
       manner, he would have known or should have known whom the owner
4       was.   All the defendant needed to do was turn in the ring to the
       management of the apartment complex where it allegedly was found.
5       Therefore, because "theft" includes lost property where the finder knew
       or should have been able to determine the true owner, the defendant's
6       claim of materiality is entirely irrelevant and baseless.

7    #16, Ex. 18, at 4-5 (emphasis in original).

8           The state district court denied the motion for a new trial in a one-sentence order on the briefing

9    without holding an evidentiary hearing.[21]

10          On direct appeal, the State pursued, *inter alia*, both of the foregoing points in response to

11   Comstock's pursuit of the issue on appeal from the conviction.[22]

12          The Supreme Court of Nevada rejected the claims presented to that court challenging the denial

13   of a new trial and alleging a *Brady* violation, on the following grounds:

14          First, we conclude that the victim's statement does not amount to
       newly discovered evidence warranting a new trial.   The victim's
15      statement is mere speculation - he wrote only that it was possible that he
       left the ring outside.   Further, the victim's statement does not contradict
16      his trial testimony or rise to the level of a recantation.   The victim
       testified that he was not aware of ever dropping the ring while outside,
17      but that he "could have" without knowing it. In fact, the victim stated
       that he was not even aware the ring was missing until he was contacted
18      by Reno detectives.   The victim was also asked on cross-examination by
       defense counsel whether he ever lost the ring outside his apartment, to
19      which the victim replied, "I don't know."   The impeachment value of the
       victim's statement was minimal and would not have created a reasonable
20      probability of a different verdict had the information been disclosed to
       the jury.   Therefore, we conclude that the district court did not abuse its
21      discretion in rejecting this claim.

22          Second, we conclude that the State's alleged failure to disclose
       information did not violate the mandate of <u>Brady</u>. <u>Brady</u> and its progeny
23      require a prosecutor to disclose favorable exculpatory and impeachment
       evidence that is material to the defense.[FN6]  A claim that the State
24      committed a <u>Brady</u> violation must show that (1) the evidence at issue is
       favorable to the accused; (2) the State failed to disclose the evidence,
25      either intentionally or inadvertently; and (3) prejudice ensued, <u>i.e.</u>, the

26   _____

27   [21]#16, Ex. 19.  See also *id.*, Ex. 20 (the court agrees that it was immaterial whether the ring was lost or stolen).

28   [22]See #16, Ex. 34, at 4-7.

-13-

1   evidence was material.  If a specific request is made for information,
2   materiality may be established upon a showing that a different result
    would have been reasonably possible if the evidence had been disclosed.
3   Determining whether the State adequately disclosed information under
    <u>Brady</u> involves both questions of fact and law, therefore, this court will
    conduct a de novo review.

4
5   [FN6] <u>See Strickler v. Greene</u>, 527 U.S. 263, 280 (1999);
    <u>see also Kyles v. Whitley</u>, 514 U.S. 419, 441-45 (1995)
6   (holding the prosecution must also disclose evidence that
    provides grounds for the defense to impeach the
    credibility of prosecution witnesses).

7
8   Initially, we note that the State disputes the assertion in the
    victim's statement that he "volunteered" information suggesting that he
9   misplaced his ring while washing his motorcycle. Further, Comstock
    cannot demonstrate that the allegedly withheld evidence was either
10  exculpatory or material, or that there was a reasonable possibility of a
    different outcome had the victim's post-verdict statement been disclosed
11  to the jury prior to the rendering of a verdict. Therefore, we conclude that
    the district court did not err in rejecting this claim.

12  #17, Ex. 40, at 2-4 (remaining citation footnotes omitted).

13      While the issue perhaps is debatable, the state supreme court's rejection of petitioner's *Brady*

14  claim nonetheless was neither contrary to nor an unreasonable application of clearly established federal

15  law as determined by the United States Supreme Court.

16      Under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, a defendant is denied due

17  process if:  (1) the State suppresses evidence either willfully or inadvertently; (2) the suppressed

18  evidence is favorable to the accused, either as exculpatory or impeachment evidence; and (3) the

19  defendant was prejudiced because the suppressed evidence was material, *i.e.*, there was a reasonable

20  probability that, had the evidence been disclosed, the result of the proceeding would have been different.

21  *See, e.g., Runningeagle v. Ryan*, 686 F.3d 758, 769 (9th Cir. 2012), *cert. denied*, 133 S.Ct. 2766 (2013).

22      Favorable evidence is material, and its suppression is unconstitutional, "if there is a reasonable

23  probability that, had the evidence been disclosed to the defense, the result of the proceeding would have

24  been different."  *United States. v. Bagley*, 473 U.S. 667, 682 (1985).  A reasonable probability is a

25  probability sufficient to undermine confidence in the outcome." *Id.*  Materiality "must be evaluated in

26  the context of the entire record." *United States v. Agurs*, 427 U.S. 97, 112 (1972).  The mere possibility

27  that undisclosed material might have helped the defense, or might have affected the outcome, is

28  insufficient to establish materiality in the constitutional sense.  *Id.*, at 109-10.

-14-

1    On the *Brady* element of suppression of information known by the State, the Supreme Court of

2  Nevada only noted that the State disputed the assertion by the victim that he had volunteered the

3  information in his post-trial statement to the State pretrial.  This Court does not read the state supreme

4  court's passing comment as reflecting any related finding of fact by the state courts, particularly given

5  that there was no state court evidentiary hearing held addressing any such factual dispute.  Nor does the

6  Court read the state court's passing comment as otherwise making an actual holding as to that element.[23]

7    The Court further is not necessarily sanguine that the evidence was not favorable under *Brady*

8  and its progeny, at the very least as impeachment evidence.  This Court, at least, likely would allow a

9  defendant in the context presented to seek to impeach a witness testifying "I don't know" as to whether

10  he had lost a ring outside with an alleged prior statement discussing a specific incident where he

11  acceded that he may have removed the ring during an outside activity and could not remember putting

12  the ring back on.  However, whether the evidence, even allowing for its possible use for impeachment,

13  was material is a different issue.[24]

14    The state supreme court's holding on the remaining conjunctive *Brady* element that the evidence

15  was not material under *Brady* was neither contrary to nor an unreasonable application of clearly

16  established federal law as determined by the United States Supreme Court.

17    Petitioner contends that the state supreme court did not adopt the theory that property could be

18  stolen property by virtue of theft in circumstances where lost property had been improperly

19  misappropriated without reasonable efforts to notify the owner.  He apparently so contends because the

20  state supreme court did not expressly mention the theory in its brief discussion.  However, the theory

21

22    [23]This Court, also, makes no factual finding or holding as to the nondisclosure element.  The elements of a
23  *Brady* violation are conjunctive, such that all of the elements must be satisfied.  Thus, for example, if the evidence in
question is not material, a court need not make a definitive holding as to the other elements.

24    Petitioner suggests in the federal reply that respondents do not contest his allegation as to the State's pretrial
25  knowledge of statements by Street equivalent to his post-trial statement.  He maintains that the allegation thus should be
deemed admitted.  #23, at 17.  The state supreme court did not ground its decision on this particular *Brady* element, and
26  respondents correspondingly focus on the basis of the state court decision, which is the pertinent focus on review under
AEDPA.  The Court finds no concession – on a point also not reached herein – in the answer.  See #22, at 6-7.

27    [24]The Court reiterates, however, that, on deferential AEDPA habeas review, a state court decision may not be
28  overturned by a federal court merely because the latter perhaps would have decided an issue differently.

1   was argued by the State in the fast track response on the direct appeal.  Merely because the state

2   supreme court said, without further express elucidation, only that "Comstock cannot demonstrate that

3   . . . there was a reasonable possibility of a different outcome had the victim's post-verdict statement

4   been disclosed to the jury" does not signify that the court declined to adopt the argument made by the

5   State in support of that ultimate conclusion.[25]

6          Petitioner maintains that he was charged in the information with having possession of stolen

7   property obtained by means of larceny, not theft.  Be that as it perhaps may be, the jury was charged,

8   *inter alia*, that "it is necessary to show that the property was the product of theft," a term that

9   encompasses the theory articulated in response to the motion for new trial.  Moreover, while the State

10  indisputably emphatically argued in support of an inference that the ring was stolen from Street's

11  apartment, either by Carter or Comstock, the State further specifically challenged in its rebuttal

12  argument the defense's proposition that a lost ring would be only "found property" rather than "stolen"

13  property.  If Comstock possessed property "that . . .was the product of theft" and thus was stolen

14  property and did so in circumstances where a person reasonably should have known that it was stolen

15  property, he was subject to conviction for possession of stolen property under Nevada law.  Comstock

16  of course had an abundance of reasons to question the legitimacy of Carter's possession of the ring and

17  no in truth objectively viable basis upon which to conclude that Carter was the lawful owner of the

18  ring.[26]  Any issue as to variance from the information and/or as to specificity of the jury charges

19  underlying the State's arguments may perhaps present other possible issues in some other posture, but

20  they do not establish a *Brady* violation and/or undermine the state court's holding on materiality.

21

22      [25]Petitioner further urges that respondents do not now defend the theory in the answer.  Respondents' answer
on these claims, stripped of the boilerplate statement of the law, indeed says very little of any specificity.  The Court

23  does not draw any inferences one way or the other, however, as to any particular issue merely because a response, across
the board, does not address a claim with any depth.

24

25      [26]Petitioner further suggests that he would have had to have a computer to seek to find the owner of the ring.
To the extent that the point would be material in the circumstances presented in Comstock's case, a maintenance worker

26  at an apartment complex that was having a rash of thefts would not have needed a computer to advise the manager that a
highly unique ring (assuming for the sake of argument a degree of truth to the Danny Carter story) was in the possession
of a known thief in even more dubious alleged circumstances.  Or simply to ask: "Does someone named Street live

27  here?"  An ability to proceed reasonably rather than quite obviously – to any reasonable person – dishonestly is not
confined to the computer age.  Any reasonable person would have known from the circumstances claimed by Comstock

28  in his statement that he was pawning stolen property.  See also text, *infra*, at 19-21.

-16-

1    The Court further is not persuaded that the state supreme court's decision was based upon an

2    unreasonable determination of fact.  Petitioner contests the following statement by the state supreme

3    court:

4                        . . . .The victim's statement is mere speculation - he wrote only

5                    that it was possible that he left the ring outside.  Further, the victim's
                     statement does not contradict his trial testimony or rise to the level of a

6                    recantation. . . . .

7    Petitioner suggests that Street unequivocally ruled out the possibility of the ring being missing in his

8    trial testimony but then stated post-trial instead that it was "likely" that he lost the ring.

9        Petitioner relies at length upon statements by the *prosecutor* either in arguing the motion for new

10   trial and/or in closing argument as to how allegedly emphatic Street was in his trial testimony as to the

11   ring being stolen.  What the *prosecutor* said at one time or another – in arguing her closing and/or a

12   motion – does not establish what *Street* said.  Both the state supreme court – and this Court – have a

13   trial transcript clearly reflecting what *Street* said.  In that regard, petitioner points to testimony – in

14   response to questions about whether the ring specifically could have been "dropped" or "fallen out of

15   his pants" – where Street said that "I don't think it would have been – would have never fallen out or

16   dropped."  When he was asked the broader question of whether he had "lost" the ring outside the

17   apartment, he instead said – to that broader and different question: "I don't know."  That is an equivocal

18   not an emphatic response, regardless of how a  prosecutor later may have described his testimony.

19       On the other hand, this Court does not agree – even looking through a *de novo* lens – with

20   petitioner's characterization that Street's 2004 written statement during the presentence investigation

21   constituted an "admission that he likely lost the ring."[27]  Street's statement that he was bringing up "the

22   possibility" that he may have placed the ring on the ground was consistent with the entire statement,

23   not an inconsistency as petitioner suggests.  He states only that he did not remember putting the ring

24   back on, which hardly is a memorable action of note and does not establish that he likely did not.

25       This Court hardly can say that no appellate panel, applying the normal standards of appellate

26   review, could reasonably conclude that the state supreme court's description of the evidence was

27

28          [27]See, e.g., #23, at 3, line 17; 20, line 2.

1    supported by the *underlying evidentiary record* , as opposed to what lawyers may have said about the

2    underlying record in one proceeding or another.  *Taylor, supra.*  It of course is axiomatic, in many

3    contexts, that what lawyers say about evidence is not evidence.

4          The state supreme court's rejection of the claim accordingly was neither contrary to nor an

5    objectively unreasonable application of *Brady* and its progeny nor was it based upon an unreasonable

6    determination of fact based the record before the state courts.[28]

7          Ground 1 therefore does not provide a basis for federal habeas relief.[29]

8    ***Ground 2: Denial of Motion for New Trial***

9          In Ground 2, petitioner alleges that he was denied rights to due process and a fair trial in

10   violation of the Fifth and Fourteenth Amendments when the state district court denied his motion for

11   a new trial based upon newly discovered evidence consisting of the ring owner's statement during the

12   presentence investigation stating that he could have lost the ring before petitioner pawned it.

13         The evidentiary and state procedural background outlined above as to Ground 1 also serves as

14   backdrop to this claim.[30]

15         On federal habeas review, this Court has held that: (a) the federal constitutional claim in Ground

16   2 was not exhausted in petitioner's first state post-conviction petition; and (b) the claim is procedurally

17   defaulted by the application of state procedural bars to the federal claim in the second state post-

18   conviction proceeding, subject only to a consideration herein of whether petitioner can demonstrate

19   actual innocence.[31]

20         The Court accordingly turns to the issue of whether petitioner can demonstrate actual innocence

21   in order to overcome the procedural default of his federal claims that were procedurally barred in the

22   state courts, including Ground 2.

23   _____

24         [28]Street's August 2, 2010, declaration (#18, Ex. 94) – executed well after both the direct appeal and the first
     state post-conviction proceedings – of course has no bearing upon Ground 1.  *Pinholster, supra.*

25
           [29]The issue of whether the state supreme court unreasonably applied *Brady* and its progeny is a debatable one
26   among jurists of reason, however; and the Court will grant a certificate of appealability as to Ground 1.

27         [30] See text, *supra*, at 3-14.

28         [31]See #31, at 3-5 & 9-13.  The Court made corresponding holdings for Grounds 3(b) and 3(d).

The Supreme Court's decision in *Schlup v. Delo*, 513 U.S. 298 (1995), states the standard that a petitioner must satisfy in order to overcome a procedural default based upon a showing of actual innocence.[32]  In order to satisfy the *Schlup* actual innocence gateway, a petitioner must come forward with new reliable evidence that was not presented at the trial that, together with the evidence adduced at trial, demonstrates that it is more likely than not that no reasonable juror would have found the petitioner guilty beyond a reasonable doubt.  513 U.S. at 327-32.  The evidence need not be newly discovered, but it must be "newly presented."  *See Griffin v. Johnson*, 350 F.3d 956, 961-63 (9th Cir. 2003).  In this regard, "actual innocence" means actual factual innocence, not mere legal insufficiency. *See, e.g., Sawyer v. Whitley*, 505 U.S. 333, 339 (1992).  The court "must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial," and "may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." *Schlup*, 513 U.S. at 332.  The exacting *Schlup* standard permits review only in the extraordinary case, but it does not require absolute certainty about the petitioner's guilt or innocence.  *E.g., Lee v. Lampert*, 653 F.3d 929, 938 (9th Cir. 2011)(*en banc*).  Rather, where new reliable evidence casts doubt on the conviction by undercutting the reliability of the proof of guilt, but not by affirmatively proving innocence, that can be enough to satisfy the *Schlup* gateway. *Id.*

In the present case, Comstock plainly cannot establish actual factual innocence of possession of stolen property under Nevada law.

The unique championship ring was "stolen property" under Nevada law regardless of whether it first was lost by Street outside or instead was stolen from inside his apartment.  "Stolen property" under N.R.S. 205.275(7) encompasses property obtained through theft, and "theft" under N.R.S. 205.0832(1)(d) encompasses the conversion of lost property without reasonable efforts to notify the true owner under circumstances providing means of inquiry.  The unique identifying marks on the ring were

---

[32]Federal habeas review of an otherwise procedurally defaulted claim is available if a fundamental miscarriage of justice would result in the absence of federal review of the defaulted claim.  However, in noncapital habeas review, judicial consideration of procedurally barred claims on the premise that to do so is necessary to avoid a fundamental miscarriage of justice is limited to demonstrated claims of actual innocence.  *See, e.g., Johnson v. Knowles*, 541 F.3d 933 (9th Cir. 2008).  A petitioner who asserts only defaulted constitutional claims without establishing actual innocence under the narrow gateway required to establish such a claim fails to satisfy the standard for the miscarriage of justice exception.  541 F.3d at 937.

the very reason for its existence – to memorialize the winning of a college wrestling championship by an individual named R. Street (with also the initials engraved inside the ring) competing in the 150 pound weight class for Northern Montana College in 1991-92.  Neither Sharon Taylor, nor Danny Carter, nor Stephen Comstock simply could appropriate the ring for the benefit of themself or another in disregard of how such a unique ring came to be before them rather than in the possession of its original owner.  Even without a computer, it would have taken no great feat of investigation to determine that a ring allegedly found right there on the apartment complex grounds belonged to a tenant at that very same complex named Randy Street.  One simple question to the apartment manager, and both Taylor and Comstock worked there, quite likely, quite easily, and quite quickly would have reunited ring and owner:  "Is there anyone named Street living here?"[33]

Clearly, Comstock had no objectively reasonable basis for believing that Danny Carter (assuming *arguendo* the truth of that particular account) lawfully possessed the ring.  Every single aspect of the situation not merely said, but instead shouted, "stolen property."[34]  *Inter alia*, Carter's alleged story that the ring was his father's ring only highlighted how obviously illicit Carter's possession of the ring was.  The ring was for a college wrestling national championship in the 150 pound individual weight class in 1991-92.  The alleged son, Carter, was approximately 30 years old in 2003-04, which would have made him approximately 18 at the time of his father's alleged college individual wrestling achievement.  A reasonable person  would have known that he was being asked

---

[33]See also text, *supra*, a 12-16, together with n.26.

In the circumstances postulated by the defense, Comstock perhaps was under no affirmative duty to conduct such an investigation when the ring allegedly was tendered to him by Carter – as opposed to simply declining to pawn the ring for him.  However, what Comstock plainly could not do – based upon the patently suspect circumstances that his own statements reflect – was go pawn the ring.  As discussed *infra*, Comstock had abundant notice that would apprise a reasonable person that he was pawning property that in one manner or another was stolen, and Nevada law does not require that he know the particulars of how the property was misappropriated in the first instance.

The Court has found no affirmative evidence in the trial record that Comstock actually knew Street by name.  Cf. #18, Ex. 88, at 36-37 & 72-73.  A maintenance worker at an apartment complex easily could do work in a tenant's apartment and/or recognize the tenant from seeing them around the complex and still not know the tenant's name.  It most certainly is conceivable, if not probable, that a maintenance worker would be dispatched to a unit simply by unit number rather than by the current tenant's name and/or that one worker simply might accompany a lead worker to a unit.

[34]See text, *supra*, at 4-6.

-20-

1  to pawn stolen property, as Comstock was being presented with "circumstances as should have caused

2  a reasonable person to know that it is stolen property."  Nevada law did not require that Comstock know

3  the specific particulars of how the unique ring came to be stolen property – *i.e.*, whether it was stolen

4  by Carter from Street's apartment or whether it instead perhaps was found after having been lost.  All

5  that he needed to do in order to violate Nevada law was to possess the stolen property (including stolen

6  by theft after being lost) in circumstances as should have caused a reasonable person to know that it is

7  stolen property.  Comstock undeniably was presented with such circumstances, in spades.[35]

8       Petitioner therefore cannot establish actual factual innocence of possession of stolen property.

9  To be sure, petitioner raises issues as to whether he initially was charged specifically with possession

10  of stolen property that had been lost by its owner and/or as to whether the jury instructions explicitly

11  delved into all of the underlying particulars of such a theory.  But such issues go to legal sufficiency,

12  not actual innocence.  On the evidence before this Court, including Street's post-verdict statements,

13  petitioner has not presented evidence tending to establish that he was actually factually innocent of

14  possession of stolen property under Nevada law.

15       For much the same reasons, petitioner cannot establish that no reasonable juror would have

16  found him guilty beyond a reasonable doubt if testimony along the lines of Street's post-verdict

17  statement had been presented to the jury.  A possibility that the ring first may have been lost rather than

18  stolen from Street's apartment in truth constitutes a red herring, as the unique ring was "stolen property"

19  under Nevada law under either scenario.

20       Ground 2 therefore is procedurally defaulted and does not provide a basis for habeas relief.[36]

21  _____

22  [35]Comstock perhaps may have been guilty of colossally bad judgement.  But it is precisely such colossally bad

23  judgement that exposes a person to criminal culpability under the law of Nevada and many states in statutes prohibiting possession of stolen property.  Even if Comstock, *arguendo*, subjectively persuaded himself that the obviously bogus

24  story allegedly given to him by a known career thief was believable in that one particular instance -- despite all then current and past circumstances pointing to exactly the opposite conclusion -- the governing standard is an objective one.

25  No reasonable person presented with the circumstances that Comstock's own statements reflect would have had an objectively reasonable basis for believing that the ring was not stolen property.

26  [36]Of course, the mere fact that a state district court allegedly errs in denying a motion for a new trial does not,

27  in and of itself, give rise to a federal constitutional violation.  Petitioner relies upon federal cases reserving the issue of whether actual innocence possibly might give rise to a freestanding claim in a noncapital habeas case.  Given that

28                                                                    (continued...)

***Ground 3(a): Effective Assistance – Failure to Appeal Denial of Motion to Suppress***

In Ground 3(a), petitioner alleges that he was denied effective assistance of appellate counsel when counsel failed to challenge the denial of a motion to suppress Comstock's statement on direct appeal.

The Supreme Court of Nevada rejected the claim presented to that court in a December 2, 2009, order of affirmance on state post-conviction review.  The court rejected the claim on the following grounds :

> Comstock first contends that the district court erred in denying his claim that his appellate counsel was ineffective for failing to challenge the denial of his motion to suppress his statement to the police. He asserts that he was in custody and his statement was given absent warnings pursuant to Miranda v. Arizona, 384 U.S. 436 (1966).  He further contends that his statement was not voluntary.
>
> To state a claim of ineffective assistance of appellate counsel, a petitioner must demonstrate that counsel's performance was deficient in that it fell "below an objective standard of reasonableness," and resulting prejudice such that "the omitted issue[s] would have a reasonable probability of success on appeal." Kirksey v. State, 112 Nev. 980, 987-88, 998, 923 P.2d 1102, 1107, 1114 (1996).  Appellate counsel is not required to raise every non-frivolous issue on appeal. Jones v. Barnes, 463 U.S. 745, 751-52 (1983).  This court has held that appellate counsel will be most effective when every conceivable issue is not raised on appeal.  Ford v. State, 105 Nev. 850, 853, 784 P.2d 951, 953 (1989).
>
> Comstock fails to demonstrate that this claim would have been successful on appeal. The record does not support a conclusion that Comstock was in custody at the time he provided statements to the police.  See State v. Taylor, 114 Nev. 1071, 1081, 968 P.2d 315, 323 (1998)(providing that Fifth Amendment privilege against self-incrimination provides that statements made by suspect during custodial interrogation are inadmissible unless police first provide Miranda warning).  Testimony at the suppression hearing demonstrated that officers asked Comstock and another individual to accompany them to the police station. Comstock agreed and rode to the station with the

---

[36](...continued)

petitioner cannot satisfy the *Schlup* actual innocence gateway, however, he clearly cannot satisfy the standard that would be required to prevail on the merits of any such freestanding actual innocence claim.  *Cf. House v. Bell*, 547 U.S. 518, 555 (2006)(claim would require "more convincing proof of innocence than *Schlup*").  Even if, as Street stated much later in 2010, he was 99.9% sure that he lost the ring, such an alleged fact would not establish Comstock's actual innocence of possession of stolen property under Nevada law.  While the obviously remorseful Street may believe that an alleged loss of the ring would establish Comstock's innocence of the offense, it in truth would not.

The Court thus would deny Ground 2, without an evidentiary hearing, even if it were to reach the merits of the claim, and even on a *de novo* review.  An alleged loss of the ring does not tend to establish innocence of the crime.

1
2
3
4
5
6

officers.  He was not handcuffed.  At the station, officers told him that he was free to leave at any time prior to speaking with him in an interview room.  Although Comstock was the target of a burglary investigation, officers began speaking to him about a bank robbery about which Comstock had information.  And Comstock was afforded a break on his request. Considering these facts, Comstock did not demonstrate that he was under formal arrest or that a restraint was placed on his freedom similar to formal arrest.  <u>See id.</u> at 1082, 968 P.2d at 323.  Further, there is no indication that these circumstances rendered his statements involuntary, requiring suppression. Therefore, we conclude that the district court did not err in denying this claim.

7   #18, Ex. 86, at 1-3.

8        The state supreme court's rejection of the claim was neither contrary to nor an objectively

9   unreasonable application of clearly established federal law as determined by the United States Supreme

10  Court.

11       On a claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test

12  of *Strickland v. Washington*, 466 U.S. 668 (1984).  He must demonstrate that: (1) counsel's performance

13  fell below an objective standard of reasonableness; and (2) counsel's defective performance caused

14  actual prejudice.  On the performance prong, the issue is not what counsel might have done differently

15  but rather is whether counsel's decisions were reasonable from his perspective at the time.  The court

16  starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct.

17  On the prejudice prong, the petitioner must demonstrate a reasonable probability that, but for counsel's

18  unprofessional errors, the result of the proceeding would have been different.  *E.g., Beardslee v.*

19  *Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

20       When evaluating claims of ineffective assistance of appellate counsel, the performance and

21  prejudice prongs of the *Strickland* standard partially overlap.  *E.g., Bailey v. Newland*, 263 F.3d 1022,

22  1028-29 (9th Cir. 2001); *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).  Effective appellate

23  advocacy requires weeding out weaker issues with less likelihood of success.  The failure to present a

24  weak issue on appeal neither falls below an objective standard of competence nor causes prejudice to

25  the client for the same reason – because the omitted issue has little or no likelihood of success on

26  appeal.  *Id.*

27       While surmounting *Strickland'*s high bar is "never an easy task," federal habeas review is

28  "doubly deferential" in a case governed by AEDPA.  In such cases, the reviewing court must take a

-23-

1    "highly deferential" look at counsel's performance through the also "highly deferential" lens of §
2    2254(d).  *Pinholster*, 131 S.Ct. at 1403 & 1410.

3          In the present case, petitioner contends that the state supreme court's decision was based upon
4    an unreasonable determination of the facts before the state courts because the court's alleged "selective
5    reading" of the record allegedly ignored a number of facts.

6          Each and every historical fact explicitly stated by the Supreme Court of Nevada was well
7    supported by the record in the state court.  The testimony at the suppression hearing and/or the transcript
8    of the statement did in fact tend to establish that: (a) officers asked Comstock and another individual
9    to accompany them to the police station;[37] (b) Comstock agreed and rode to the station with the
10   officers;[38] (c) he  was not handcuffed;[39] (d) at the station, officers told him that he was free to leave at
11   any time prior to speaking with them;[40] (e) although Comstock was the target of a burglary
12   investigation, officers began speaking to him about a bank robbery about which Comstock had
13   information;[41] and (f) Comstock was afforded a break on his request.[42]  Petitioner points to no
14   affirmative statement of historical fact by the state supreme court that was not, amply, supported by the
15   record before the state courts.

16         Petitioner cites no legal authority establishing that a state supreme court's decision is based upon
17   an unreasonable determination of the facts under AEDPA if the state court's order does not explicitly
18   discuss every jot and tittle of a factual argument relied upon by a petitioner.  The United States Supreme
19   Court instead clearly has instructed that extensive articulation of a state court's rationale – or, indeed,

---

[37]#16, Ex. 12, at 5-7; see also *id.*, at 14.

[38]#16, Ex. 12, at 5-7.  The officers likely would have driven Comstock to the station regardless, but the Court notes that Comstock did not have a car.  See #18, Ex. 88, at 17.

[39]#16, Ex. 12, at 7-8.

[40]#16, Ex. 12, at 7 & 9; see also #18, Ex. 88, at 14.  The officers offered to drive Comstock back if he wanted to leave. #18, Ex. 88, at 14.

[41]#16, Ex. 12, at 9; #18, Ex. 88, at 1-13.

[42]#16, Ex. 12, at 10; #18, Ex. 88, at 51-52.

-24-

1  any articulation at all – is not a prerequisite to AEDPA deference.  *See Harrington v. Richter*, 131 S.Ct.

2  770, 784 (2011).  Petitioner's inherent underlying premise that a state court makes an unreasonable

3  determination of the facts unless it explicitly discusses all of the factual arguments made by a petitioner

4  is unsupported by any apposite citation and flies in the face of established Supreme Court authority

5  regarding the manner in which AEDPA review is conducted.

6       Nor do the alleged facts that petitioner suggests that the state supreme court ignored establish

7  a basis for the suppression of Comstock's statement.

8       Petitioner posits:

9

10            Here, the Nevada Supreme Court's analysis ignored facts that
         would have convinced a reasonable person in Comstock's situation that
         he was in police custody, whatever their purported representations to the

11       contrary.  The police "interview" began when four police officers
         showed up at Comstock's manager's office, and "asked" Comstock to

12       come with them to the police station, two or three miles away. Id. 6, 11.
         At this time, Comstock was already a "target" of the police's Repeat

13       Offender Program ("ROP"); indeed, the police had been monitoring him
         for some time. Id. 12. The officers "anticipated" that they would bring

14       Comstock back to the police station, and in fact they did.  Id. 10.

15            At the police station, Comstock was "escorted at all times" by the
         officers. Ex. 12, pg. 8. He was questioned by four different police

16       officers in the "interview" room. Id. 9. Throughout their questioning, the
         police suggested that Comstock was guilty of stealing items from the

17       apartment complex. Id. 70-72.  They told him that he pawned a ring that
         was "stolen" from Randy Street's apartment, Id. 73, even though they

18       knew that Street had made no such claim. Ex. 13, pg. 70.  They refused
         to accept Comstock's answers, suggesting that he must be lying because

19       of his previous criminal history (Ex. 88, pp. 74-76), and suggesting that
         he would be implicated by other people. Id., pg. 77. The police

20       repeatedly claimed that Comstock knew the ring was stolen. Id., pg. 64,
         75, 81. The police asked him if he would be willing to take a polygraph

21       examination.  Id., pg. 86.

22  #23, at 24.

23       *Miranda* bars the admission of statements made during a custodial interrogation without the

24  *Miranda* warnings first having been given. *E.g., Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004).

25  The custody determination is fact specific and the ultimate inquiry is whether there is a formal arrest

26  or restraint on freedom of movement of the degree associated with a formal arrest.  541 U.S. at 662.

27       At the very outset, under clearly established law by the United States Supreme Court, the fact

28  that the police may view the person being questioned as a suspect does not establish that the questioning

-25-

1    is custodial.  *See Yarborough*, 541 U.S. at 662.   Accordingly, the fact that Comstock was a target of

2    the investigation – a fact that the Supreme Court of Nevada indeed explicitly acknowledged in its

3    decision – does not support a conclusion that the interview was custodial.  Similarly, the accompanying

4    subsidiary facts that officers had been monitoring Comstock under the Repeat Offender Program and

5    that they anticipated that they would ask to interview him back at the station did not make the interview

6    custodial.[43]

7         Petitioner further overstates the amount of involvement by the four officers, referring to what

8    "the officers" and "they" did and asked.  According to the detective's testimony, four officers went to

9    the apartment complex because they anticipated asking the two maintenance men to return to the

10   station, and the officers were in unmarked vehicles which did not have a restraining partition between

11   the rear and front seats.  In such circumstances, they had one person ride in a car with two officers,

12   hence the initial presence of four plainclothes detectives.[44]  At the station, Comstock was interviewed

13   in a room with two officers, with Detective Thomas conducting the vast majority of the questioning.[45]

14   When Comstock took a break, Detective Thomas escorted him to the restroom door and back, given

15   that, for a number of obvious reasons, individuals are not allowed to move around a police station

16   unescorted.[46]  Thus, petitioner's suggestion that Comstock was subjected to a constant and overbearing

17   presence of four officers escorting him from place to place and collectively interrogating him is an

18   erroneous representation of the record.  Four officers were present at the apartment complex; Comstock

19   rode to the station with two officers; two officers were in the interview room; one officer asked the vast

20   majority of the questions; and one officer escorted Comstock to the restroom door when he took a

21   break.  Nothing in that scenario provides a basis for suppressing his statement.

22

23   [43]Detective Thomas gave uncontradicted and unchallenged testimony at the suppression hearing that if

24   Comstock had declined the request that "I'd imagine we would have probably talked to other people in the apartment complex, but I couldn't have done anything else [*i.e.*, with Comstock] at that time." #16, Ex. 12, at 14.  A police intention to ask a person to come to the station for questioning does not render the questioning custodial.

25

26   [44]#16, Ex. 12, at 5-6 & 10-11.

27   [45]#16, Ex. 12, at 8-9; #18, Ex. 88.  The other two detectives were in another interview room with the other worker.

28   [46]#16, Ex. 12, at 8 & 10.

1    Petitioner otherwise points to the manner in which the interview was conducted by Detective

2    Thomas as a basis for finding that Comstock was in custody and/or for otherwise suppressing his

3    statement.  All of the alleged things that petitioner maintains that the police did – allegedly suggesting

4    that Comstock was guilty of an offense, suggesting that the ring was stolen, refusing to accept

5    Comstock's story, suggesting that he must be lying because of his prior criminal history, suggesting that

6    he would be implicated by other people, claiming that he knew that the ring was stolen, and asking

7    whether he would be willing to take a polygraph – would be, both singly and collectively – entirely

8    permissible interview methods.  Nothing in either *Miranda* or other Supreme Court authority establishes

9    that the use of such clearly permissible police interview methods renders an interview either custodial

10   or otherwise impermissible.

11       In that vein, the Court notes that a reading of the entire statement in any event does not support

12   petitioner's description of the interview as being conducted in an oppressive, overbearing manner.  One

13   cannot read the statement and fairly come to a conclusion that Detective Thomas browbeat Comstock

14   as opposed to instead patiently cajoling information from him.[47]  Comstock volunteered early on in the

15   discussion of the ring – in response to an open-ended question without prompting by the detective – that

16   he knew that the ring was stolen.[48]  It was in no sense impermissible for the detective to hearken back

17   to a characterization that Comstock himself had volunteered,  and all of the record citations by petitioner

18   in the federal reply as to what the detectives said in that regard *follow* in the statement after what

19   Comstock volunteered initially.  Nor was it an impermissible inference by the police that the ring was

20   stolen given that Street did not realize that it was gone until Detective Thomas told him that it had been

21   pawned, following a string of thefts at the same apartment complex.  Even if such inferences *arguendo*

22   were not supported at the time, nothing in the governing law prevents an investigating detective from

23   making a factual assertion to an interviewee that is not supported by the evidence then known to him,

24   as officers question multiple different sources seeking to ferret out the truth.

25

26

27       [47]Cf. #16, Ex. 12, at 18 (the state district court referred to "the defendant's very free flow of conversation with the officer," which is how the statement reads to this Court as well).

28       [48]#18, Ex. 88, at 59 ("I'm sure he stole it.").  Comstock thereafter elaborated on the point without prompting.

-27-

1        In sum, to the extent that such facts were "ignored" by the Supreme Court of Nevada by not

2    explicitly discussing them in its written order, it was because such facts did not establish a persuasive

3    basis for suppressing Comstock's statement.   The factual points that the state supreme court did

4    explicitly refer to were abundantly supported by the state court record, and the state high court's

5    rejection of the claim of ineffective assistance of appellate counsel was not an unreasonable application

6    of *Miranda*, *Strickland*, or other United States Supreme Court precedent.   Tellingly, petitioner cites no

7    apposite Supreme Court precedent establishing that the state supreme court's rejection of the claim on

8    the facts upon which he relies that have record support was an objectively unreasonable application of

9    clearly established federal law as determined by the Supreme Court.   Even on a *de novo* review, this

10   Court would have denied a motion to suppress on the facts that were before the state courts.   Those facts

11   did not provide a persuasive basis upon which to suppress Comstock's statement.

12        Ground 3(a) therefore does not provide a basis for federal habeas relief.[49]

13        ***Ground 3(b): Effective Assistance – Failure to Challenge Sufficiency of the Evidence***

14        In Ground 3(b), petitioner alleges that he was denied effective assistance of trial and appellate

15   counsel when counsel failed to challenge the sufficiency of the evidence on direct appeal.

16        On federal habeas review, this Court has held that: (a) the federal constitutional claim in Ground

17   3(b) was not exhausted in petitioner's first state post-conviction petition; and (b) the claim is

18   procedurally defaulted by the application of state procedural bars to the federal claim in the second state

19

20

---

21       [49]Petitioner suggests that the state supreme court made no holding as to deficient performance because it allegedly discussed only resulting prejudice.  Given the overlap under the governing law discussed in the text between

22  the performance and prejudice prongs on a claim of ineffective assistance of appellate counsel, this Court is not sanguine that the state supreme court's holding applied only to the prejudice prong.  In all events, whether on deferential or *de*

23  *novo* review, neither the performance nor the prejudice prong can be satisfied on this claim.  Appellate counsel neither rendered deficient performance nor caused resulting prejudice by failing to pursue such an insubstantial issue on direct

24  appeal.

25       As to this claim as well, what respondents did or did not specifically argue in their minimal response does not have a bearing on this Court's decision.  This Court decides such issues based upon the state court record.  Nor does

26  appellate counsel's inability to remember years later at a state post-conviction evidentiary hearing specifically why she did not pursue a particular issue on appeal have a significant bearing on this Court's decision.  It is petitioner's burden –

27  not that of respondents or former counsel – to establish that petitioner is entitled to federal habeas relief.  Petitioner has not carried that burden on this claim.  From the state court record, it is patently evident that there was not a reasonable

28  probability of success on the issue on direct appeal.

1  post-conviction proceeding, subject only to a consideration herein of whether petitioner can demonstrate
2  actual innocence.[50]

3      As discussed above regarding Ground 2, petitioner cannot demonstrate actual factual innocence
4  to satisfy the narrow *Schlup* actual innocence gateway.  Comstock would not be actually factually
5  innocent of possession of stolen property under Nevada law even if the highly unique ring *arguendo*
6  first had been lost by Street.[51]

7      Ground 3(b) therefore is procedurally defaulted and does not provide a basis for habeas relief.[52]

8  ***Ground 3(c): Effective Assistance – Habitual Criminal Adjudication and Sentencing***

9      In Ground 3(c), petitioner alleges that he was denied effective assistance of counsel when
10  counsel: (1) failed to challenge the introduction of his prior convictions; (2) failed to make any
11  argument about the appropriateness of finding Comstock a habitual criminal based upon his prior
12  convictions; (3) failed to challenge the judge's decision for a lack of specific findings that a habitual
13  criminal adjudication was appropriate; and (4) failed to call any witnesses for Comstock at the
14  sentencing.

15      Respondents responded to this ground in the answer as having been addressed by the Supreme
16  Court of Nevada on the first state post-conviction appeal.[53]

17      However, the claim presented and exhausted on the first post-conviction appeal instead was a
18  substantive claim that the state district court erred by adjudicating petitioner as a habitual criminal

---

20      [50]See #31, at 3-13, including discussion particular to Grounds 3(b) and 3(d), at 5-9.

21      [51]See text, *supra*, at 18-21.

22      [52]The Court in any event would not find on a *de novo* review that trial or appellate counsel rendered ineffective
performance in not challenging the sufficiency of the evidence.  Petitioner posits that Street's testimony – in response to
a general question – that he did not know whether he ever had lost the ring outside precluded the jury from finding that
the property was the "product of theft."  However, first, as discussed previously as to Grounds 1 and 2, the concept of
"theft" under Nevada law encompasses circumstances where lost property has been improperly misappropriated without
reasonable efforts to notify the owner.  Second, the jury had before it substantial circumstantial evidence from which the
jury could infer that the ring had been actively stolen, and it need not determine by whom.  The fact that Street was not
aware that the ring was even gone until Detective Thomas called him and thereafter did not know specifically how it
came to be gone did not render the evidence presented at trial insufficient to convict Comstock of possession of stolen
property.  See text, *supra*, at 12-16 & 19-21.

28      [53]#22, at 8-9.

-29-

without submitting the issue to a jury, relying upon *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Other than the fact that the state court and federal court claims in some sense concerned the habitual criminal adjudication, the claims are entirely – and clearly – distinct. The substantive claim presented and exhausted on the state post-conviction appeal alleged that petitioner was adjudicated as a habitual criminal in violation of *Apprendi*.[54] The claim presented in federal court instead alleged ineffective assistance of counsel and further on grounds having nothing to do with *Apprendi*.

Ground 3(c) therefore was not exhausted in the first state post-conviction proceedings.

Thereafter, in the second state post-conviction proceedings, the Supreme Court of Nevada held that the corresponding claims were procedurally barred.[55]

If a procedural default defense had been raised to Ground 3(c), the ground thus potentially would have been subject to dismissal on that basis. Respondents, however, did not raise such a defense to the ground, at any time herein. The Court's last scheduling order was abundantly clear that defenses that were not raised by the final supplemental response would be waived.[56]

Any otherwise viable procedural default defense to Ground 3(c) therefore has been waived. *See, e.g. Morrison v. Mahoney*, 399 F.3d 1042, 1046 (9th Cir. 2005)("*Unless a court has ordered otherwise, separate motions to dismiss may be filed asserting different affirmative defenses.*")(emphasis added). The Court sees no reason apparent from the record for ignoring this waiver and *sua sponte* interposing a procedural default defense. *See generally Vang v. Nevada*, 329 F.3d 1069, 1073 (9th Cir. 2003). Among other things, it is, well past, time for this case to be fully resolved; and respondents have had ample opportunity to respond to the claims and raise all applicable defenses. Further delay and further proceedings, so as to allow petitioner an opportunity to respond to such a *sua sponte* defense, would be in the interests of neither comity, federalism, judicial efficiency, nor justice.

The Court accordingly addresses the claims on the merits, subdivided below as Grounds 3(c)(1), (2), (3) and (4).

---

[54] #18, Ex. 82, at 7-11; *id.*, #86, at 3-4.

[55] #25, Ex.103.

[56] #27, at 1, lines 20-22, & 2, lines 17-19.

*Ground 3(c)(1)*

Petitioner suggests that counsel may have been ineffective for failing to challenge the introduction of his prior convictions.

The presentence investigation report reflected that Stephen Comstock had been convicted of the following felony offenses prior to the August 14, 2003, offense in the present case:

| Conviction Date | Charge(s) | Jurisdiction | Additional Notes |
| --- | --- | --- | --- |
| 12-20-1977 | Vehicle Theft | Wyoming | NA |
| 03-02-1978 | Burglary | Wyoming | Parole Revoked |
| 02-01-1980 | Burglary/Assault | Wyoming | Expired Parole |
| 05-14-1987 | Taking Veh. w/o consent | California | NA[57] |
| 03-12-1991 | Possession Stolen Property | Nevada | Dishonorable Discharge[58] |
| 05-01-1998 | Use of Controlled Substance | Nevada | NA |
| 10-14-1998 | Use of Controlled Substance | Nevada | Honorable Discharge |
| 09-03-1998 | Possession Forged Instru. (2) | Nevada | Dishonorable Discharge[59] |

#18, Ex. 89, at 2-3 (drawn from).

At the December 8, 2004, sentencing, the State introduced certified copies of five prior convictions. The transcript reflects that the prior convictions had been shown to defense counsel, and the convictions were admitted expressly without objection, as a numbered exhibit in that proceeding.[60]

/ / / /

_____

[57]Comstock was sentenced to 36 months probation and 270 days in county jail, with the latter being suspended. The next entry in the presentence investigation report reflects a September 24, 1987, California arrest – within the probationary period – for felony possession of a stolen motor vehicle. A bench warrant in connection with the charge was active, but in California only. #18, Ex. 89, at 2-3.

[58]Petitioner was incarcerated by the Nevada Department of Corrections (NDOC) until his release on parole on March 23, 1992; and he was dishonorably discharged on March 7, 1994. #18, Ex. 89, at 3.

[59]Comstock was incarcerated by the NDOC for nearly 4 of the 5 years between his last felony conviction and the present offense. He was paroled on July 23, 2002, only a little over a year prior to his August 14, 2003, offense in the present case. Comstock was arrested a month after being paroled for an alleged parole violation on August 29, 2002; and he was dishonorably discharged on March 26, 2003. #18, Ex. 89, at 3.

[60]#16, Ex. 20, at 4.

-31-

1    Petitioner does not point to any evidence in the state court record, whether in the original

2  criminal proceedings, on direct appeal, or in two state post-conviction proceedings, tending to establish

3  that any of the five convictions admitted in evidence at the sentencing were in any manner inadmissible

4  or deficient.

5    Petitioner – who has the burden of persuasion and proof on federal habeas review – has not

6  tendered any evidence on federal habeas review that remotely would call the validity and admissibility

7  of any of the five prior felony convictions relied upon at his sentencing into question.

8    In the first amended petition, petitioner states only:

9        Hubach did nothing to challenge the introduction of Comstock's
         prior alleged offenses, which were necessary for him to be sentenced as
10       an habitual offender.  Ex. 20, pg. 4; N.R.S. 207.010(1)(b).  But even
         assuming, arguendo, that such a challenge would have been futile,
11       Hubach's representation was deficient in several respects.

12  #14, at 19.

13    In the federal reply, petitioner presents no argument seeking to establish that any of the five

14  convictions upon which his habitual criminal adjudication was based was inadmissible or otherwise

15  deficient.[61]

16    This bare and conclusory claim fails to state a claim upon which relief may be granted under

17  Rule 2 of the Rules Governing Section 2254 Cases.  If petitioner suggests in his pleadings that counsel

18  was ineffective because she "did nothing" to challenge the introduction of his prior convictions, he must

19  establish why the failure to object constituted deficient performance with resulting prejudice.  The mere

20  suggestion that counsel did not challenge the introduction of prior convictions as to which petitioner

21  does not identify a single alleged deficiency clearly does not state a claim for relief under *Strickland*.

22    Following a *de novo* review, Ground 3(c)(1) does not provide a basis for federal habeas relief.[62]

23    / / / /

24  _____

25    [61]#23, at 28-29.

26    [62]*See, e.g., Chaker v. Crogan*, 428 F.3d 1215 (9th Cir. 2005)(the federal claim was reviewed *de novo* where the
   procedural default defense had been waived and no state court had reached the merits of the claim).

27

28    Petitioner perhaps may not intend to actually pursue a claim in this regard.  However, the Court cannot simply
   assume that petitioner does not intend to pursue an allegation in the federal petition questioning counsel's representation.

*Ground 3(c)(2)*

Petitioner contends that counsel was ineffective for failing to make any argument about the appropriateness of finding Comstock a habitual criminal based upon his prior convictions.

The State sought a habitual criminal adjudication under N.R.S. 207.010(1)(b). Under the statute, as in force at the time of the offense and sentencing, a person with three qualifying prior felony convictions was subject to possible sentencing to either 10 to 25 years, 10 years to life, or life without the possibility of parole.[63]  The State sought the lesser of the three possible sentences.[64]

Defense counsel's argument at sentencing included the following:

> . . . . I am going to ask you do not follow the recommendation. Specifically, I direct the Court's attention to the attached letter from the victim in this case.
>
> We previously filed a motion in that regard which has been denied [referring to the motion for a new trial]. I don't want to belabor that point. But I would point out to the Court that Mr. Comstock has two treatment options available to him and would very much like to explore that as a possibility of alternative sentencing this morning. He's received an acceptance letter from Delancey Street, which is a two year program. I also have placement in the Salvation Army program, which would be a six-month program.
>
> At this point I would ask you consider a term of probation, maximum five years, but a condition of which be he immediately be transported to either Delancey Street or the Salvation Army so he can address his addiction problem.  He does have an extensive criminal history.  He has had prior opportunities for treatment.  However, he's at a point in his life where he wants, needs and has actually taken steps to get the help that I think would be appropriate in this case.
>
> Again, I think if the Court puts any weight into the victim's letter at all, I think probation would be an appropriate punishment in this case, especially in light of the comments made by him.

#16, Ex. 20, at 3-4.

The court ultimately was not persuaded by the argument that Randy Street's letter warranted the sentence of probation sought by defense counsel:

---

[63] *I.e.*, on the parole-eligible possible sentences, a sentence for a definite term of 25 years, with eligibility for parole after a minimum of 10 years, or a sentence of life with eligibility for parole after a minimum of 10 years.

[64] See #16, Ex. 20, at 5-7 & 8.

1

2          I have read and considered the letter from Mr. Street, and of
           course I heard Mr. Street's testimony at the trial, over which I presided.
3          I do agree with Ms. Erickson that it really is immaterial whether the ring
           was lost or stolen.  It was a unique item.  The owner of the ring was
4          identifiable from the ring itself.  The owner lived in an apartment house
           with which the defendant was associated.  And the defendant by his own
5          admission admits he received the ring under circumstances in which it
           was reasonable and obvious that it was stolen and that the defendant was
6          not entitled to possession of it.   Rather than returning the ring, the
           defendant pawned it.

7   #16, Ex. 20, at 9.

8          The court acknowledged that "[t]hat is a relatively minor criminal act in the scheme of things

9   that come before the Court."  The court continued:  "However, the purpose of the habitual criminal

10  statutes is to bring to the Court's consideration at sentencing the defendant's prior criminal record."

11  The court adjudged Comstock a habitual criminal and imposed the minimum 10 to 25 year sentence

12  provided for in the statute.[65]

13         On federal habeas review, petitioner does not provide any particularized argument specifying

14  what defense counsel could or should have argued that would have given rise to a reasonable probability

15  of a different outcome on the habitual criminal adjudication.[66]

16         On the conclusory allegations presented on federal review, this Court, on a *de novo* review does

17  not find that petitioner has demonstrated either deficient performance or resulting prejudice.

18         Petitioner urges in the first amended petition that counsel failed to make any argument about

19  the appropriateness of finding petitioner a habitual offender based upon his prior convictions.  However,

20  an argument that petitioner instead should be placed upon probation in the circumstances presented was

21  antithetical to a habitual criminal adjudication.  While petitioner dismisses this argument as only "a

22  token request," the transcript instead reflects that defense counsel made a credible argument in the

23  circumstances presented for imposition of a sentence less than the 10 to 25 year minimum sentence on

24  a habitual criminal adjudication.

25

26  ――――――――――

27         [65]#16, Ex. 20, at 9-10.

28         [66]Petitioner instead focuses his attention in the reply – in terms of specific argument –  essentially exclusively on Ground 3(c)(3) discussed *infra*.

-34-

1        Petitioner further points to the judge's discretion to dismiss a habitual criminal charge if he finds

2    the prior convictions stale or trivial or if such an adjudication would not serve the ends of justice.

3    However, Comstock's prior convictions were neither stale nor trivial,[67] and he committed the instant

4    offense only approximately a year after being released on parole following four years of incarceration

5    on his most recent conviction.  Moreover, while counsel did not explicitly invoke the phrase "ends of

6    justice," it is abundantly evident from the transcript that counsel was urging that a habitual criminal

7    adjudication was not warranted in the circumstances presented given Street's post-verdict letter.

8        Nor is the Court persuaded that there was a reasonable probability of a different outcome based

9    upon an as-yet unarticulated different argument.

10        As the state district court noted, the focus on a habitual criminal adjudication is not only upon

11    the current crime but also on the defendant's prior criminal history.  Comstock's criminal record did

12    not reflect mere indiscretions of youth committed years prior to achieving more wisdom and maturity.

13    He was approximately 17 at the time of his first conviction for vehicle theft, but he was approximately

14    38 at the time of his 1998 convictions and approximately 43 at the time of the instant offense.[68]   There

15    indeed were gaps between the 1991 and 1998 convictions and between the 1998 convictions and the

16    present conviction.  However, Comstock was in prison for part of the time after 1991, and the gap was

17    followed by multiple felony convictions.  He further was incarcerated for four of the approximately five

18    years between 1998 and 2003.  After his release on parole on July 23, 2002, he was back in trouble with

19    the instant offense in only approximately a year.

20        Comstock's criminal history thus presents no sustained track record of having changed his prior

21    habits and thereafter remaining out of trouble.  He instead repeatedly was coming back into the criminal

22    justice system on repeat offenses.  Moreover, the present conviction for possession of stolen property

23    clearly was not Comstock's first involvement with property crimes of theft, burglary, forgery, and/or

24    possession of stolen property.  Indeed, if there ever were an individual who should have had his eyes

25    wide open going into such an obviously criminal transaction, it was Comstock.

26

---

27        [67]See the summary of the prior convictions listed in the presentence report in the text, *supra*, at 31.

28        [68]Comstock's year of birth is 1960. #18, Ex. 89, at 1.

1    The Court notes that Comstock continued to interact with Danny Carter, who he extensively

2    described as a known thief.[69]  He then pawned a ring for Carter – under, at best, the most highly

3    suspicious of circumstances – and did so in exchange for, per Comstock's own words, a carton of

4    cigarettes from a larger load of stolen cigarettes.[70]  While Comstock maintains that he was working

5    productively and had turned a corner away from his prior criminal ways, such was neither the

6    association nor the action of a person who had done so.

7         Petitioner accordingly has not persuasively articulated a nonconclusory basis for finding that

8    counsel was ineffective for failing to make any argument about the appropriateness of finding Comstock

9    a habitual criminal based upon his prior convictions.  Petitioner instead presented quite arguably a

10   paradigm case for habitual criminal treatment following a recurring pattern of criminal behavior to

11   which he readily had returned only approximately a year after his then most recent four year stint in

12   prison.

13        On a *de novo* review, Ground 3(c)(2) therefore does not provide a basis for federal habeas relief.

14                                    ***Ground 3(c)(3)***

15        Petitioner contends that counsel was ineffective for failing to challenge the judge's decision for

16   a lack of specific findings that a habitual criminal adjudication was appropriate.

17        The state district court issued the last reasoned decision on the merits of a corresponding claim.

18   The state district court found:

19

20              . . . Comstock alleges that counsel was ineffective on appeal
           because he failed to claim that the Court erred in adjudicating him a
           habitual criminal.  As noted above, counsel's failure to raise this omitted

21         claim amounts to ineffective assistance only if the claim had merit.  In
           adjudicating Comstock a habitual criminal, the Court reviewed

22         Comstock's prior convictions, determined them to be valid, and then
           reviewed the facts of this case together with general penological goals

23         unique to the sentencing of recidivists generally and to Comstock
           specifically.  This Court's analysis is consistent with the [Nevada]

24         Supreme Court's suggested methodology and could not be deemed an
           abuse of discretion.  It necessarily follows that, had counsel argued that

25         the Court erred in adjudicating Comstock a habitual criminal, that

26   _____

27   [69]See text and record cites, *supra*, at 4-5.

28   [70]#18, Ex. 88, at 88-89.

                                        -36-

1
2

> argument would not enjoy a reasonable likelihood of success on appeal.
> As a result, counsel's failure to raise the claim was neither unreasonable
> nor prejudicial.

3    #18, Ex. 76, at 8.

4        Petitioner contends that the 1995 decision in *Walker v. Deeds*, 50 F.3d 670 (9th Cir. 1995),

5   establishes that he was denied due process of law because the sentencing judge, as allegedly required

6   under Nevada law, did not expressly decide that it was just and proper to adjudicate Comstock a

7   habitual criminal after clearly disclosing that he weighed the appropriate factors for and against habitual

8   criminal treatment.  Petitioner maintains that counsel therefore was ineffective for failing to object to

9   the absence of such express findings, in the trial court and on appeal.

10       In *Walker*, the Ninth Circuit based its federal due process holding on an underlying conclusion

11  that, under Nevada state law, "[t]he sentencing judge . . . is required to make 'an actual judgment on

12  the question of whether it [i]s *just and proper* for [the defendant] to be punished and segregated as a

13  habitual criminal'" . . . [and must] "'clearly disclose' that it 'weighed the appropriate factors for and

14  against the criminal enhancement.'" 50 F.3d at 672 (quoting prior state authority; emphasis in *Walker*).

15       In its 2000 decision in *Hughes v. State*, 116 Nev. 327, 996 P.2d 890 (2000), the Supreme Court

16  of Nevada rejected *Walker's* analysis of the underlying state law issue:

17

18

19

20

21

22

23

24

25

26

27

28

> As yet, this court has not addressed *Walker* in a published
> opinion. We take this opportunity to do so. Our primary concern in
> [*Clark v. State*, 109 Nev. 426, 851 P.2d 426 (1993),] was that the
> sentencing court may have misunderstood the law and, as a result, did
> not exercise its discretion in adjudicating Clark as a habitual criminal.
> The *Walker* court's interpretation of *Clark* is correct to the extent that it
> states that Nevada law requires a sentencing court to exercise its
> discretion and weigh the appropriate factors for and against the habitual
> criminal statute before adjudicating a person as a habitual criminal.
> However, nothing in *Clark* stands for the proposition that in meeting this
> obligation the sentencing court must utter specific phrases or make
> "particularized findings" that it is "just and proper" to adjudicate a
> defendant as a habitual criminal.  The sole issue pursuant to *Clark* is
> whether the sentencing court actually exercised its discretion. While it
> may be easier to answer this question if the sentencing court makes
> particularized findings and specifically addresses the nature and gravity
> of the prior convictions, this court has never required the district courts
> to utter "talismanic" phrases.  *See Bryant v. State*, 102 Nev. 268, 721
> P.2d 364 (1986). Instead, this court looks to the record as a whole to
> determine whether the sentencing court actually exercised its discretion.
> Thus, as long as the record as a whole indicates that the sentencing court
> was not operating under a misconception of the law regarding the

1
2

> discretionary nature of a habitual criminal adjudication and that the court exercised its discretion, the sentencing court has met its obligation under Nevada law.

3   116 Nev. at 332-33, 996 P.2d at 893-94.

4   The Supreme Court of Nevada of course is the final arbiter of Nevada state law.  When

5   Comstock was sentenced in 2004, the 2000 decision of the Supreme Court of Nevada in *Hughes*, not

6   the 1995 federal court of appeals decision in *Walker*, stated the governing rule of Nevada state law

7   regarding what findings state law required a court to articulate in a habitual criminal adjudication.

8   Accordingly, if counsel had objected under *Walker* to the lack of express findings, at the

9   sentencing and/or on appeal, the objection clearly would have been rejected by the state courts under

10   the governing state law precedent in *Hughes*.

11   The outcome is no different now on federal habeas review, even if the claim *arguendo* is

12   reviewed *de novo* and the Court further assumes *arguendo* that a failure of state court counsel to

13   preserve an objection for later federal habeas review provides a basis for an ineffective assistance claim.

14   While this Court clearly is bound by the federal law holdings of the Ninth Circuit on such a *de*

15   *novo* review in a habeas matter, the pertinent legal issue is the underlying Nevada state law issue of

16   what express findings are required in a Nevada habitual criminal adjudication.  On that issue, this Court,

17   just as is the Ninth Circuit, is bound by the state law holdings of the Supreme Court of Nevada.[71]

18   Ground 3(c)(3) thus does not provide a basis for federal habeas relief.  The claim does not

19   provide a basis for relief regardless of whether the claim is reviewed *de novo* or instead on deferential

20   AEDPA review of the last reasoned decision of the state district court on state post-conviction review

21   as to a claim of ineffective assistance of appellate counsel.

22   ***Ground 3(c)(4)***

23   Petitioner alleges that counsel was ineffective for failing to call any witnesses at the sentencing.

24   The state district court issued the last reasoned decision on the merits of a corresponding claim.

25   The state district court found in pertinent part:

26

27

28
[71]*Accord Harman v. Schomig*, No. 2:04-cv-00950-RCJ-GWF, 2007 WL 529761, at *6 (D. Nev. Feb. 24, 2007).

-38-

1

2              . . . Comstock alleges that, because trial counsel failed to present
          certain character witnesses and mitigating evidence at sentencing, he was
3          deprived of effective assistance of trial counsel, and as a result, his state
          and federal constitutional rights were violated.  Since none of the
4          omitted witnesses testified in our evidentiary hearing, the Court finds
          and concludes that counsel's failure to call these witnesses, assuming it
5          to have been unreasonable, was not proved to be prejudicial under the
          *Strickland* test.

6    #18, Ex. 76, at 7.

7          On federal habeas review, petitioner alleges in the first amended petition that Comstock

8    provided counsel, via a letter dated August 1, 2004, the names, addresses and phone numbers of four

9    individuals to serve as character witnesses and to demonstrate that he was gainfully employed.  The four

10   individuals were Lucky Mitchell, Lisa Minor, Jerry Jacobs, and James Comstock.  The letter and/or

11   other record materials reflect that Mitchell and James Comstock were petitioner's uncle and brother

12   respectively, Lisa Minor was his girlfriend or fiancée, and Jerry Jacobs was the apartment manager

13   where he had worked.   Petitioner further alleges that counsel did not call Randy Street to testify live

14   following his letter to the judge submitted with the presentence report.[72]

15         Petitioner does not present specific argument on the claim in the federal reply.

16         To the extent that deferential review under AEDPA is applicable to this claim, petitioner cannot

17   establish that the state district court's rejection of the claim was either contrary to or an unreasonable

18   application of clearly established federal law as determined by the United States Supreme Court.  First,

19   there is no clearly established federal law under Supreme Court precedent establishing standards

20   governing claims of ineffective assistance at a noncapital sentencing.  *See, e.g., Davis v. Grigas*, 443

21   F.3d 1155, 1158 (9th Cir. 2006); *Vigil v. McDonald*, 2011 WL 5116915 (9th Cir. Oct. 28, 2011).  Second,

22   petitioner did not come forward with witnesses at the state evidentiary hearing to substantiate the claim.

23   The state district court's rejection of a factually unsubstantiated claim where there was no governing

24   standard under Supreme Court precedent did not constitute an objectively unreasonable application of

25   clearly established federal law.

26         / / / /

27

28        [72]#14, at 19; #17, Ex. 45, at electronic docketing page 102; #18, Ex. 88, at 26.

                                        -39-

1    This Court further is not persuaded on a *de novo* review that petitioner can establish a reasonable

2    probability of a different outcome at sentencing from a failure to call the witnesses.

3    There is not a reasonable probability that testimony from the victim Randy Street that Comstock

4    should not be held accountable because Street believed that he lost the ring would have led to a different

5    outcome at sentencing.  The sentencing judge addressed Street's post-verdict account and explained

6    why it did not lead him to a different decision because the point was immaterial.[73]  As this Court further

7    has outlined at length, an alleged loss of the ring by Street would not have absolved Comstock of

8    criminal responsibility.[74]  Street apparently had become remorseful after the trial due to his erroneous

9    belief that Comstock could not be found guilty if Street had lost the ring.  There is not a reasonable

10   probability that an impassioned plea in live testimony based upon this mistaken belief would have led

11   to a different outcome at sentencing.

12   Nor is there a reasonable probability that calling two relatives, a girlfriend/fiancée and

13   petitioner's employer would have led to a different outcome at sentencing.  The record already

14   established that Comstock was employed and had a girlfriend.  There is not a reasonable probability

15   that, on the habitual criminal adjudication, testimony from such witnesses would have overcome the

16   fact that petitioner had a long history of convictions for property crime and that he returned to such

17   crime only approximately a year after being released on parole following four years in state prison.

18   While petitioner seeks to minimize the circumstances of the crime, his own statement reflects that he

19   pawned a ring under highly questionable circumstances for a known thief for which he received yet

20   further stolen property.[75]  There is not a reasonable probability that testimony from relatives, a

21   girlfriend, and an employer would override petitioner's own past and then current actions to avoid a

22   habitual criminal adjudication.  Such testimony clearly could not mitigate the sentence that Comstock

23   received as a habitual criminal under N.R.S. 207.010(1)(b), because he received the minimum sentence

24   of the three sentences possible under that provision.

25   _____

26   [73]See text, *supra*, at 34.

27   [74]See text, *supra*, at 12-16 & 19-21.

28   [75]See text, *supra*, at 31 & 35-36.  That the latter property was worth only around $30 is immaterial to this point.

-40-

1    Ground 3(c)(4) accordingly does not provide a basis for federal habeas relief, whether on

2    deferential or *de novo* review.

3    ### Ground 3(d): Effective Assistance – Failure to Challenge Value of the Ring

4        In Ground 3(d), petitioner alleges that he was denied effective assistance of trial counsel when

5    counsel failed to investigate the value of the ring in an effort to establish that it was worth less than the

6    $250.00 value required for the offense.

7        As with Ground 3(b), this Court has held that: (a) Ground 3(d) was not exhausted in petitioner's

8    first state post-conviction petition; and (b) the claim is procedurally defaulted by the application of state

9    procedural bars to the federal claim in the second state post-conviction proceeding, subject only to a

10   consideration herein of whether petitioner can demonstrate actual innocence.[76]

11       As discussed above regarding Ground 2, petitioner cannot demonstrate actual factual innocence

12   in order to satisfy the narrow *Schlup* gateway.  Comstock would not be actually factually innocent of

13   possession of stolen property under Nevada law even if the highly unique ring *arguendo* first had been

14   lost by Street.[77]

15       Ground 3(b) therefore is procedurally defaulted and does not provide a basis for habeas relief.[78]

16   / / / /

17   _____

18   [76]See #31, at 3-13, including discussion particular to Grounds 3(b) and 3(d), at 5-9.

19   [77]See text, *supra*, at 18-21.

20   [78]Comstock never has presented any evidence as to what such an investigation would have revealed.  At trial,
     the pawn broker testified that the gold ring had a retail value of around $600.00 and that he would sell the pawned ring
21   at anywhere from $300.00 to $600.00.  He further testified that the ring being bent would take no time to remedy and
     would not affect its value. #16, Ex. 13, at 24-26.  The State also presented testimony by a professional jeweler with then
22   33 years of experience.  He testified that the manufacturer would charge more than $500.00 to replace the ring.  *Id.*, at
     47-50.  At the state evidentiary hearing, counsel testified that the defense consulted with individuals who he believed
23   were sufficiently qualified to appraise the ring for him to determine that challenging the value of the ring would not be a
     viable avenue of defense.  See #17, Ex. 67, at 58-59, 60-63, 69-70, 76-79 & 81-84.  In the last reasoned state court
24   decision on the claim, the state district court held, *inter alia*, that petitioner had not demonstrated prejudice under
     *Strickland* because, at the 2008 evidentiary hearing, petitioner did not present any evidence of what a professional
25   appraisal would have shown if pursued.  See #18, Ex. 76, at 4.  Petitioner never has presented more than the bare
     speculation that further investigation would have resulted in discovery of an appraisal placing the value of the ring under
26   $250.00.  On federal habeas review, petitioner has presented a statement by Randy Street reflecting that he lost the ring
     in January 2010, which would have been before the filing of the federal petition. See #18, Ex. 94.  Petitioner has the
27   burden of proof on habeas review.  If there no longer is any conceivable possibility of proving resulting prejudice on an
     ineffective assistance claim due to an intervening loss of evidence, petitioner simply cannot carry his burden of proof.

28

-41-

1    ***Consideration of Possible Issuance of a Certificate of Appealability***

2           Under Rule 11 of the Rules Governing Section 2254 Cases, the Court must issue or deny a

3    certificate of appealability (COA) when it enters a final order adverse to Petitioner.

4           As to the claims rejected on the merits, under 28 U.S.C. § 2253(c), a petitioner must make a

5    "substantial showing of the denial of a constitutional right" in order to obtain a certificate of

6    appealability. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000); *Hiivala v. Wood*, 195 F.3d 1098, 1104

7    (9th Cir. 1999). To satisfy this standard, the petitioner "must demonstrate that reasonable jurists would

8    find the district court's assessment of the constitutional claim debatable or wrong." *Slack*, 529 U.S. at

9    484.

10          As to claims rejected on procedural grounds, the petitioner must show: (1) that jurists of reason

11   would find it debatable whether the petition stated a valid claim of a denial of a constitutional right; and

12   (2) that jurists of reason would find it debatable whether the district court was correct in its procedural

13   ruling. *Slack*, 529 U.S. at 484. While both showings must be made to obtain a COA, "a court may find

14   that it can dispose of the application in a fair and prompt manner if it proceeds first to resolve the issue

15   whose answer is more apparent from the record and arguments." 529 U.S. at 485. Where a plain

16   procedural bar is properly invoked, an appeal is not warranted. 529 U.S. at 484.

17          The Court will grant a certificate of appealability as to its rejection of Ground 1 on the merits.

18   The Court remains of the view that its ruling on this ground was correctly decided. However, the issue

19   is sufficiently debatable by jurists of reason.

20          The Court will deny a COA as to its denial of Grounds 2, 3(b) and 3(d) as procedurally defaulted

21   and its denial of Grounds 3(a) and 3(c) on the merits.

22          Jurists of reason would not find the Court's rejection of the procedurally defaulted claims to be

23   debatable or wrong. Grounds 2, 3(b) and 3(d) clearly are procedurally defaulted. **See #31.** Petitioner

24   further cannot demonstrate actual factual innocence in order to establish that a fundamental miscarriage

25   of justice would result without federal review of the claims. Petitioner proceeds on the premise that he

26   could not have been convicted of possession of stolen property if there had been no burglary of the

27   owner's apartment and the owner instead lost the highly unique ring that petitioner pawned. This

28   premise is fundamentally flawed under Nevada law. **See text, *supra*, at 18-21, 28-29 & 41.**

1        Jurists of reason would not find the rejection of Ground 3(a) on the merits to be debatable or

2    wrong.  In Ground 3(a), petitioner alleges that he was denied effective assistance of appellate counsel

3    when counsel failed to challenge the denial of a motion to suppress Comstock's statement on direct

4    appeal.  Petitioner clearly was not in custody for purposes of *Miranda*, and the circumstances of the

5    police interview otherwise did not present a basis for suppressing the statement.  Petitioner has not

6    established either that the state supreme court's rejection of the claim was based upon an unreasonable

7    determination of fact or that the court's decision was contrary to or an unreasonable application of

8    clearly established federal law.  This Court would have denied a motion to suppress based on the same

9    factual circumstances presented to the state courts.  **See text,** ***supra*****, at 22-28.**

10       Jurists of reason would not find the rejection of Ground 3(c) on the merits to be debatable or

11   wrong.[79]  In Ground 3(c), petitioner alleges that he was denied effective assistance of counsel when

12   counsel: (1) failed to challenge the introduction of his prior convictions; (2) failed to make any

13   argument about the appropriateness of finding Comstock a habitual criminal based upon his prior

14   convictions; (3) failed to challenge the judge's decision for a lack of specific findings that a habitual

15   criminal adjudication was appropriate; and (4) failed to call any witnesses for Comstock at the

16   sentencing.  However, petitioner: (1) identifies no basis for challenging the introduction of any of the

17   prior convictions from his extensive prior criminal history, **see text,** ***supra*****, at 31-32**; (2) cannot

18   establish a reasonable probability that a different argument than the argument counsel in fact made at

19   sentencing would have led to a different outcome, given petitioner's extensive criminal history and the

20   actual circumstances of the instant offense, **see text,** ***supra*****, at 33-36**; (3) cannot establish the underlying

21   state law predicate for a due process claim as to the 2004 sentencing under 1995 Ninth Circuit precedent

22   due to an intervening 2000 decision by the Supreme Court of Nevada rejecting the Ninth Circuit's

23   reading of Nevada state law, **see text,** ***supra*****, at 36-38**; and (4) cannot establish a reasonable probability

24   of a different outcome at sentencing if counsel had called petitioner's uncle, brother, girlfriend, and

25   employer and/or the crime victim at sentencing given petitioner's extensive criminal history and the

26   _____

27        [79]Ground 3(c) in subject to a potentially viable procedural default defense, but the defense has been waived as
     to this claim and the Court sees no reason apparent from the record to relieve respondents from the waiver at this late
28   juncture in the case.  See text, *supra*, at 29-30.

1  actual circumstances of the instant offense, **see text,** *supra*, **at 38-41**.  On the last subclaim, while the

2  victim may have believed that a loss of the ring would have precluded petitioner's guilt, that was not

3  the case under Nevada law, as expressly noted by the state district judge at sentencing.  There is not a

4  reasonable probability that an impassioned plea to the same effect by the victim in live testimony at the

5  sentencing would have led to a different outcome.

6          IT THEREFORE IS ORDERED that all claims in the petition, as amended, are DENIED with

7  prejudice, on the merits as to Grounds 1, 3(a) and 3(c) and on the basis of procedural default as to

8  Grounds 2, 3(b) and 3(d), and that this action shall be DISMISSED with prejudice.

9          IT FURTHER IS ORDERED that a certificate of appealability is GRANTED IN PART and

10  DENIED IN PART, such that a certificate of appealability is GRANTED as to Ground 1 and is DENIED

11  as to all other claims.  **See text,** *supra*, **at 42-44.**

12          The Clerk shall enter final judgment accordingly in favor of respondents and against petitioner,

13  dismissing this action with prejudice.[80]

14          DATED this 12th day of February, 2014.

15

16

17                                                    _____

18                                                    LARRY R. HICKS
                                                      UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

27  [80]Petitioner's request for an evidentiary hearing is denied, as review under AEDPA is restricted to the record
presented to the state court that adjudicated the merits of the claims.  *See Pinholster,* 131 S.Ct. at 1398-1401.  Petitioner

28  otherwise has not presented a viable basis for an evidentiary hearing in this matter as to the claims dismissed on the basis
of procedural default or considered on *de novo* review herein.